THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAUL S. GILMORE, Defendant-Appellant.

Second District   No. 2—03—1105

Opinion filed March 30, 2005.—Modified on denial of rehearings April 29, 2005.

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, for appellant.

John A. Barsanti, State's Attorney, of St. Charles (Martin P. Moltz and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CALLUM delivered the opinion of the court:

## I. INTRODUCTION

A jury found defendant, Paul S. Gilmore, guilty of murder (720 ILCS 5/9—1(a)(1) (West 2000)), and the trial court sentenced him to 32 years' imprisonment. On appeal, defendant contends that the trial court erred by (1) admitting, pursuant to the dying declaration exception to the hearsay rule, statements the victim made to police officers while receiving treatment at the hospital and (2) summarily denying his *pro se* posttrial motion alleging that his trial counsel was ineffective. We affirm the trial court's decision to admit the victim's statements but must remand the cause for a further hearing on defendant's *pro se* posttrial motion.

## II. BACKGROUND

The State charged defendant with murder and aggravated criminal sexual assault (720 ILCS 5/12—14(a)(2) (West 2000)) and notified defendant that it would seek to introduce statements the victim, Donald Harvey, made shortly before his death. The trial court

conducted a hearing to determine the admissibility of Harvey's statements. During the hearing, A.C. Span testified that he was Harvey's roommate. At about 5 a.m. on March 31, 2001, Span was sleeping when the sound of a gunshot awoke him. After first looking out his window, he went downstairs, where he saw Harvey lying supine on the floor just inside the doorway to their apartment. Harvey told Span that he had been shot, he could not move his legs, and his mouth was dry. Harvey's speech was soft and slurred, but Span was able to understand him. Harvey appeared to be in pain and gasped for air a couple of times. Span did not see any blood.

Span asked what had happened. Harvey replied, "I opened the door up. He was standing at the door, the guy we got to fighting with. He shot me, and he ran." Span turned off the lights and instructed the others in the apartment to go upstairs. He got some water for Harvey and asked his neighbors to call 911. At about this time, Harvey said that he was dying. Span testified, however, that he could not remember if he later told the police about this statement. Span estimated that the police and paramedics arrived 15 to 20 minutes after he heard the gunshot. Harvey went in an ambulance to the hospital.

Dr. William Mollohan testified that he treated Harvey, who arrived at the emergency room at 5:45 a.m. Dr. Mollohan spoke with Harvey shortly after Harvey arrived. When Dr. Mollohan first saw Harvey, Harvey was conscious and alert. He had been shot in the chest and was in critical condition. Harvey had a half-inch-diameter hole in his chest and a corresponding exit wound of about the same size in his back. Dr. Mollohan asked Harvey how he was doing and if he could breathe, and Harvey responded that he was not doing well. Harvey was able to answer several specific questions about his condition. He stated that he believed that he had been shot at close range with a handgun. He reported that he could not move his legs, felt light-headed, and was experiencing pain that could be classified as "10" on a scale of 1 to 10.

Dr. Mollohan believed that Harvey's prognosis was poor. He said to Harvey, "you are obviously in rough shape. *** We need to attend to you here in the ER and give you emergency treatment and prepare you for emergency surgery." Medical personnel took a blood test and inserted a chest tube to remove blood and to prevent further lung collapse. Shortly before Harvey went into surgery, his blood pressure "bottomed out" and he had no palpable pulse. At 6:24 a.m., Harvey was taken into surgery, where he died.

Detective Christine Johnson of the Carpentersville police department testified that she saw Harvey in the emergency room shortly

before 6 a.m. Because medical personnel were attending to Harvey, Johnson was able to spend only about two minutes speaking to him. Harvey was lying on a gurney and had an oxygen mask over his face and intravenous needles in his arm. He appeared to be in pain and had some difficulty speaking. Johnson asked Harvey if he knew the name of the person who shot him. Harvey replied that he did not know the person's name but he had fought with the person earlier that evening. He added that Span also had fought with the person and perhaps knew his name. Harvey said that the person was male, African-American, and taller than Harvey. Later that day, Johnson was present when Span gave a taped statement. The parties stipulated that, during the statement, Span never claimed that Harvey said he was dying.

The trial court found beyond a reasonable doubt that the elements for admitting a dying declaration had been satisfied. In finding that Harvey believed that his death was imminent, the court relied on the direct evidence that Harvey said he was dying and also the evidence about the seriousness of Harvey's wounds.

Three days before the trial, defense counsel informed the court that she was unable to serve a witness, Patricia Holley, with a subpoena. Counsel stated that she did not need to request a continuance because the parties were working on a stipulation regarding Holley's testimony. No such stipulation was offered during the trial, however.

During the trial, Dionna Ross testified that, in 2000, she was convicted of aggravated battery, for which she was sentenced to probation and fined. A judge issued a warrant for Ross's arrest when she failed to appear in court to pay the fine. The State informed the judge that Ross was a witness in the present cause, and the judge recalled the warrant. Ross had a pending court date to pay the fine, and her testimony in the present cause would have no bearing on the outcome of the other matter.

On March 30, 2001, Ross was staying in the apartment of Harvey and her boyfriend, Span. The apartment was at 11 Oxford in the Foxview Apartments. Also staying in the apartment were April Herd; April's son, Darrell; and Patricia Holley. At about 10 p.m., Harvey asked Ross to get a friend who lived in the same complex, at 20 Oxford. When Ross knocked on the door of the friend's apartment, defendant answered and told Ross that the friend was not home. Ross did not know defendant at the time. She described defendant as having no hair on his head and unkempt facial hair.

Ross went into the apartment to wait. She had with her two beers that she had brought from Span and Harvey's apartment. Ross and

defendant sat down, smoked some marijuana, and talked. Ross stayed in the apartment for three to four hours. When she started to leave, defendant prevented her from doing so. Defendant then forced Ross to perform oral sex on him. Afterwards, he allowed Ross to leave.

Ross returned to Span and Harvey's apartment and told them what had happened. She explained that she did not know the person who attacked her. Ross, Span, and Harvey went to the other apartment, but nobody answered the door. On their way back to their apartment, the three saw a group of people in the parking lot. Ross spotted defendant and stood next to him. Span accused defendant of raping his girlfriend. Defendant replied, "your bitch sucked my dick." Span then began punching defendant. Span gave defendant "a good beating" that was "enough to break his jaw," while defendant was unable to "get any licks in." While the fight was in progress, Span and Harvey directed Ross to return to the apartment.

Span and Harvey returned about 30 minutes later, and Ross spoke to them about the events of the evening. Eventually, Ross went to bed. The sound of a gunshot awoke Ross. Holley knocked on the bedroom door and said that Harvey had been shot. Ross went downstairs and saw Harvey lying on the floor. Span went over to Harvey, and Harvey said, "The [bald-headed] dude who we got into it with just came and shot me."

Because there was no telephone in the apartment, Span yelled to a group of people outside and asked them to call the police. Eventually, Span went across the hall and asked the neighbors to call the police.

Span testified that, in 1991, he was convicted of felony and misdemeanor thefts. At the time of the trial, Span faced charges of residential burglary, possession of a stolen motor vehicle, misdemeanor theft, and aggravated theft on a public way. The incident giving rise to the charges occurred before Harvey's death. Span was in the midst of plea negotiations that would result in the dismissal of the residential burglary charge and a sentence of probation and time served for possession of a stolen motor vehicle. Span asserted that the possession charge was the only one for which the State had evidence sufficient to convict him. He explained that the outcome of the charges pending against him was not contingent in any way on his testimony during defendant's trial.

Span testified that Ross left his apartment at about 10 p.m. to find a friend. When Ross returned at about 12 a.m., she was very upset and said that she had been raped. Ross led Span and Harvey to the apartment where the incident took place. Nobody answered the door, and the three headed back to their apartment. The group spotted defendant in the parking lot, and Ross identified him as the person

who had attacked her. Span and defendant began fighting. Span testified that he was "winning" the fight. Defendant asked the people in the crowd to help him, but no one did. When Span grew tired of fighting, Harvey took over. Harvey and defendant fought for about 10 minutes, and Harvey was winning the fight. Span broke up the fight, and Span and Harvey went home. Span spoke with Ross for a while and then went to sleep at about 1 a.m.

At about 5 a.m., a gunshot awoke Span. He then heard the outer door to his building slam shut. Span ran to his bedroom window, which overlooked the parking lot. He saw defendant exit the building, run across the parking lot, and enter 20 Oxford. Span heard someone in a group outside ask, "Did you get him?" Defendant was holding something in his right hand. Span went downstairs, where he saw Harvey lying on the floor. Span checked for blood but did not see any. Harvey said "that the guy we got in the fight with shot him." Span asked a neighbor to call 911. The police arrived first, about 20 minutes later. Span picked defendant's photograph out of a lineup and later identified defendant during an in-person lineup.

Detective Timothy Bosshart testified that, in response to a dispatch, he arrived at Harvey's apartment at about 5:10 a.m. While at the scene, he recovered a .45-caliber shell casing. Bosshart explained that, when someone fires a semiautomatic gun, the shell is ejected, and the next round moves into place. In contrast, when someone fires a revolver, the shell remains in the cylinder and must be extracted manually.

Larry Nichols testified that he lived in the apartment complex where the shooting took place. Nichols saw defendant during the day on March 30, 2001, but had no conversation with him.

Nichols acknowledged that, on April 5, 2001, he was arrested for possessing and delivering a controlled substance. While in custody, Nichols was questioned about the March 31, 2001, shooting. Initially, Nichols told the detectives that he did not know anything about it. The detectives continued to pressure Nichols, and he told them that he saw defendant walking towards the apartment building shortly after defendant was involved in the fight. Defendant was "bruised up" and said the person he had been fighting was too big for him. He asked Nichols if he had a gun and said that he was going to shoot the person he had been fighting. Explaining why he told the police these things, Nichols stated, "I was scared. They told me they was going to work me out a deal. I told them anything to get myself out of trouble, but it didn't happen."

Dr. Bryan Mitchell testified that he performed the autopsy on Harvey's body. According to Dr. Mitchell, the bullet struck Harvey's

liver and the inferior vena cava, which is the principal vein that carries blood back from the lower part of the body. The latter injury caused a great deal of blood loss in the abdominal cavity. There was no evidence of external bleeding and no indication that Harvey had been shot at close range, *i.e.*, from a distance of 3 to 18 inches.

Jeanette Wesley testified that in 1999 she pleaded guilty to misdemeanor retail theft and received supervision. While on supervision, Wesley was charged with providing false information on a charge slip, a felony, and was sentenced to probation, which she had successfully completed by the time of defendant's trial.

During the early morning hours of March 31, 2001, Wesley was at her home in the Foxview Apartments. Defendant and Fanny Moore were present with Wesley. Defendant had been limping for about 10 days and complained of pain in his right leg. Defendant had a scratch on his face. He stated that he had just been in a fight with two other men, was upset because nobody in the crowd helped him during the fight, and was thinking about revenge by either fighting them one-on-one or shooting out their windows. Defendant removed a gun from a grocery bag and wiped the gun with a cloth. The gun was the type that used a "clip" to store bullets. Defendant said that "he knew which one he wanted, but it didn't matter which one he got."

Wesley spent one to two hours trying to calm down defendant and talk him out of doing anything drastic. Between 3 and 3:30 a.m., when Wesley believed that defendant had calmed down sufficiently, she went to sleep in her living room. Defendant also was in the living room. When Wesley woke up between 7 and 7:30 a.m., defendant was in the apartment. Wesley did not see either the gun or the grocery bag. At 8 or 9 a.m., Wesley and Moore drove defendant to Chicago. As Wesley was leaving, she noticed police officers in the parking lot. Wesley did not see defendant again after March 31, 2001, but did speak to him over the telephone two or three times.

Moore testified that she lived at the Foxview Apartments and witnessed the fight between Span, Harvey, and defendant. After the fight broke up, Moore went to Wesley's apartment. Less than an hour later, defendant arrived. He had a bruised face and appeared to be upset. Defendant said that he either would fight the two men again when he was sober or would "shoot up the windows." He removed a gun from a grocery bag that he had with him. Moore went upstairs and locked herself in a room. When she emerged from the room at about 6 a.m., defendant was present, but she did not see the gun. Wesley and Moore drove defendant to his mother's house in Chicago.

Moore acknowledged that, on June 18, 2001, she told police that she saw the gun inside of the bag. She omitted telling the police that

she saw defendant take the gun out of the bag because she was scared and did not want to be involved in the case in any way.

Douglas Ridolfi testified that he worked as a forensic scientist for the Illinois State Police Forensic Science Laboratory. He received blood standards from Ross and defendant and two semen stains taken from the sweatshirt Ross wore on March 30 and 31, 2001, and performed DNA testing on them. Ridolfi opined that the DNA profile from the semen stains matched defendant's DNA profile. He testified that there was a 1-in-14 quintillion probability that another black person in the general population had the same profile.

Detective Michael Salvaggio testified that he and Detective Johnson were at Sherman Hospital at about 6 a.m. on March 31, 2001. Harvey was lying on a gurney, and medical personnel in the trauma room were attending to him. The physicians treating Harvey gave Johnson and Salvaggio permission to speak with Harvey briefly. Johnson asked Harvey if he could understand what she was saying, and Harvey replied that he could. Johnson then asked Harvey if he could tell her who shot him. Harvey responded that he did not know the person's name, but that "he had gotten into it earlier with the person." Harvey said that Span also was involved in the fight and might know the person's name. Harvey described the person as an African-American male who was taller than Harvey and in his thirties. Harvey was then taken into surgery.

On January 29, 2003, the jury found defendant guilty of murder but acquitted him of aggravated criminal sexual assault. On March 20, 2003, defense counsel filed a posttrial motion asserting that the trial court erred in admitting Harvey's statements to Span and Detective Salvaggio and that the State failed to prove defendant's guilt beyond a reasonable doubt. On April 30, 2003, the trial court denied the motion, proceeded directly to the sentencing hearing, and sentenced defendant to 32 years' imprisonment.

On May 7, 2003, defendant filed a *pro se* motion for a new trial, alleging the ineffective assistance of counsel. Specifically, defendant claimed that counsel failed to (1) conduct effective cross-examination; (2) bring out the details of the witnesses' prior convictions; and (3) locate and call Patricia Holley. Additionally, the motion asserted that African-Americans and Hispanics were improperly excluded from the jury. On May 28, 2003, the trial court ruled that "having previously heard defendant's posttrial motions and having previously ruled thereon; It is hereby ordered that pro se motion for new trial is denied." No hearing on the *pro se* motion was held on May 28, 2003, or at any other time.

Meanwhile, on May 13, 2003, defense counsel had moved to reduce

the sentence. On September 26, 2003, the trial court denied the motion. Defendant timely appealed.

## III. DISCUSSION

### A. Dying Declaration

■ Defendant argues that the trial court erred in admitting Harvey's statements to Detectives Salvaggio and Johnson as dying declarations. Defendant states that he is not challenging Harvey's statement to Span. He concedes that, even if the statement to Span was not admissible as a dying declaration, it appears that it was admissible as a spontaneous declaration. See *People v. Williams*, 193 Ill. 2d 306, 352 (2000) (for a hearsay statement to be admissible under the spontaneous declaration exception, (1) there must be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, (2) there must be an absence of time for the declarant to fabricate the statement, and (3) the statement must relate to the circumstances of the occurrence).

A dying declaration is a statement of fact that the victim had made about the cause or circumstances of the homicide. *People v. Georgakapoulos*, 303 Ill. App. 3d 1001, 1008 (1999). It is admissible as an exception to the hearsay rule because it poses a guarantee of trustworthiness based on the assumption that the belief of impending death excludes the possibility of fabrication by the declarant. *Georgakapoulos*, 303 Ill. App. 3d at 1008.

■ Defendant's threshold contention is that statements admitted pursuant to the dying declaration exception to the hearsay rule violate a criminal defendant's constitutional right to confront the witnesses against him (U.S. Const., amend. VI). In *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), the Court substantially altered the confrontation clause analysis approved in *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980). *Roberts* had held that the confrontation clause did not prohibit the admission of an unavailable witness's statement against a defendant if the evidence either fell within a firmly rooted hearsay exception or bore particularized guarantees of trustworthiness. *Roberts*, 448 U.S. at 66, 65 L. Ed. 2d at 608, 100 S. Ct. at 2539.

*Crawford* concluded that *Roberts* did not hold true to the historical underpinnings of the confrontation clause. *Crawford* held that testimonial statements of a witness who is absent from the trial may be admitted only where the declarant is unavailable and the defendant had a prior opportunity to cross-examine him or her. *Crawford*, 541 U.S. at 59, 68, 158 L. Ed. 2d at 197, 203, 124 S. Ct. at 1369, 1374. The Court stated that it was leaving for another day any effort to spell

out a comprehensive definition of "testimonial." It did rule, however, that testimonial evidence includes at a minimum "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and *** police interrogations." *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374.

Harvey's statements to the detectives are testimonial because they were "made in response to police questioning while the police were conducting an investigation into the *** commission of a crime." *People v. Victors*, 353 Ill. App. 3d 801, 812 (2004) (statements implicating defendant that domestic battery victim made to police officer while officer was investigating the incident were testimonial). The issue, however, is whether *Crawford* applies to dying declarations. Examining the historical basis for the confrontation clause, the Court stated that "there is scant evidence that exceptions [to the hearsay rule] were invoked to admit *testimonial* statements against the accused in a *criminal* case." (Emphasis in original.) *Crawford*, 541 U.S. at 56, 158 L. Ed. 2d at 195, 124 S. Ct. at 1367. In a footnote, the Court continued:

> "The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. [Citations.] Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. [Citations.] We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*." *Crawford*, 541 U.S. at 56 n.6, 158 L. Ed. 2d at 195 n.6, 124 S. Ct. at 1367 n.6.

Although the statement just quoted is *dicta*, we view it as a strong indication that the Court does not believe that admitting testimonial dying declarations violates the confrontation clause. Following the *dicta* in *Crawford*, the supreme court of California has ruled that the dying declaration exception to the hearsay rule existed at common law and therefore was not repudiated by the sixth amendment. *People v. Monterroso*, 34 Cal. 4th 743, 763-65, 101 P.3d 956, 971-72, 22 Cal. Rptr. 3d 1, 19-20 (2004). *Monterroso* reasoned that:

> "if, as *Crawford* teaches, the confrontation clause 'is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding' [citations], it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment." *Monterroso*, 34 Cal. 4th at 765, 101 P.3d at 972, 22 Cal. Rptr. 3d at 20, quoting *Crawford*, 541 U.S. at 54, 158 L. Ed. 2d at 194, 124 S. Ct. at 1365.

Defendant directs us to *United States v. Jordan*, No. 04—CR—229—B (D. Colo. March 3, 2005), slip op. at 2, which ruled that admit-

ting statements pursuant to the dying declaration exception violates the confrontation clause. The *Jordan* court reasoned that, whether driven by reliability, necessity, or both, the dying declaration exception is contrary to the "sweeping prohibitions" set forth in *Crawford*. *Jordan*, slip op. at 3.

We believe that the reasoning of *Monterroso* represents the sensible approach and choose to follow it instead of *Jordan*. *Crawford* provided an in-depth discussion of the right of confrontation as it existed at the time the sixth amendment was ratified and offered a strong statement regarding the admissibility of dying declarations. Considering the Supreme Court's guidance on the issue, we are reluctant to expand that right beyond the historical parameters indicated in *Crawford*.

Also, we note that, in 1994, the confrontation clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 8) was amended to conform with the language of the confrontation clause of the United States Constitution. See *People v. McClanahan*, 191 Ill. 2d 127, 131 n.1 (2000). To interpret the confrontation clause of the Illinois Constitution as providing greater protection than its federal counterpart, " '[w]e must find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution.' " *People v. Cox*, 202 Ill. 2d 462, 482 (2002), quoting *People v. Tisler*, 103 Ill. 2d 226, 245 (1984). Defendant advances no such argument here. Accordingly, we conclude that there is no constitutional impediment to admitting Harvey's statements.

■ Having considered defendant's constitutional arguments, we now turn to the requirements for admitting a dying declaration. They are that (1) the declaration pertains to the cause or circumstances of the homicide; (2) the declarant possesses the fixed belief and moral conviction that death is impending and almost certain to follow almost immediately; and (3) the declarant possesses mental faculties sufficient to give an accurate statement about the cause or circumstances of the homicide. *Georgakapoulos*, 303 Ill. App. 3d at 1009; *People v. Walker*, 262 Ill. App. 3d 796, 801 (1994). Belief in the imminence of death may be shown by the declarant's own statements or from circumstantial evidence, such as the nature of the wounds or statements made in the declarant's presence. *Georgakapoulos*, 303 Ill. App. 3d at 1009.

■ The proponent must prove the elements beyond a reasonable doubt. *Georgakapoulos*, 303 Ill. App. 3d at 1009. Courts of review are reluctant to overturn a trial court's ruling on the admissibility of a dy-

ing declaration and will do so only if it is palpably against the manifest weight of the evidence. *Georgakapoulos*, 303 Ill. App. 3d at 1009; see also *People v. Harris*, 236 Ill. App. 3d 574, 578-79 (1992) (trial court's ruling will be upheld if the record supports the trial court's factual findings regarding the declarant's state of mind). We disagree with defendant's claim that our review should be *de novo*. We have recognized that a reviewing court may review *de novo* a trial court's decision to admit hearsay when the decision does not involve fact-finding or weighing the credibility of witnesses. *People v. Nestrock*, 316 Ill. App. 3d 1, 13 (2000). Contrary to defendant's assertion, however, the issues here, particularly whether Harvey believed that death was imminent, are intensely factual. Although the core facts may not be disputed, the inferences to be drawn from those facts are disputed. Therefore, we apply the deferential standard of review.

■ There is no dispute about the presence of the first element. Harvey's statements clearly pertained to the circumstances of the homicide. Defendant challenges the trial court's finding that Harvey believed that his death was imminent. There was direct evidence that, shortly after he was shot, Harvey stated that he was dying. Defendant responds first that Span's testimony to that effect was suspect because Span did not report this statement during his interview with the police. The trial court was aware of the content of Span's statement to the police and nevertheless chose to credit his testimony. That Span omitted the statement during his police interview does not make his testimony so improbable that the trial court was required to reject it.

Defendant responds second that significant time had passed between Harvey's statement that he was dying and his conversation with the detectives at the hospital. According to defendant, it is possible that, while at the hospital, Harvey no longer believed he was dying. The evidence supports a finding that Harvey continued to believe he was about to die. Shortly after being shot in the chest, Harvey had difficulty speaking and breathing, was in pain, and could not move his legs. Harvey's condition at the hospital remained the same. See *People v. Webb*, 125 Ill. App. 3d 924, 937 (1984) (relying in part on lack of evidence that victim's condition had improved during seven hours between time victim indicated that he believed he would die and time he identified defendant). At the hospital, Harvey reported that he believed he had been shot at close range and was not doing well. Specifically, he stated that he could not move his legs, felt light-headed, and was experiencing severe pain. Dr. Mollohan told Harvey that he was in "rough shape" and was about to undergo emergency surgery.

We conclude that the evidence was sufficient to allow the trial court to find beyond a reasonable doubt that Harvey's statements

were admissible as dying declarations. See *Walker*, 262 Ill. App. 3d at 801 (although there was no direct evidence that victim believed his death was imminent, the evidence was sufficient to support trial court's decision to allow victim's statements where victim knew he had been shot twice and was bleeding, complained of being unable to breathe, and was in such pain that he asked that no one touch him). It was proper for the trial court to consider, along with Harvey's direct statement that he was dying, the circumstantial evidence about the nature of Harvey's wounds, Dr. Mollohan's statement to Harvey, and Dr. Mollohan's opinion about Harvey's condition. *Georgakapoulos*, 303 Ill. App. 3d at 1010.

The decisions upon which defendant relies are distinguishable. In *Harris*, there was no evidence that the victim made statements indicating that she believed she was going to die or that medical personnel advised the victim about her condition. *Harris*, 236 Ill. App. 3d at 579. Also, *Harris* provides no support for a reversal here because the reviewing court merely upheld the trial court's decision not to admit the victim's statement as a dying declaration. In *People v. Montague*, 149 Ill. App. 3d 332, 345-46 (1986), a police officer told the victim that he was seriously injured, but the victim was never told and never expressed any belief that he was dying. In fact, the victim attempted to leave, and the officer had to settle him back down on the floor. In *People v. Odum*, 27 Ill. 2d 237, 243-44 (1963), although several police officers told the victim that his condition was serious and that he might die, no medical personnel had advised him that he faced imminent death. When the victim asked an attending nurse if he was " 'in pretty bad shape' " the nurse replied, " 'I wouldn't say that because I have seen worse cases.' " *Odum*, 27 Ill. 2d at 241-42. According to the court, "[w]hat the victim himself said cannot be construed as indicating that he had abandoned hope." *Odum*, 27 Ill. 2d at 243.

For these reasons, we hold that the trial court's ruling that Harvey's statements to the detectives qualified as dying declarations was not against the manifest weight of the evidence.

## B. Summary Denial of *Pro Se* Posttrial Motion

Defendant argues second that, because his *pro se* posttrial motion alleged the ineffective assistance of counsel, the trial court could not summarily deny it. The State's only response is that the trial court acted appropriately because the motion was untimely.

A defendant must file a motion for a new trial "within 30 days following the entry of a finding or the return of a verdict." 725 ILCS 5/116—1(b) (West 2002). The trial court certainly has the discretion to deny leave to file a posttrial motion beyond the prescribed 30-day

period. *People v. Harper*, 347 Ill. App. 3d 499, 502 (2004). The trial court here did not strike the *pro se* motion as untimely, however. Instead, the court apparently felt that the *pro se* motion should have been denied because a posttrial motion already had been filed and denied. This court has recognized that, "[a]lthough it has been held that the limitation as to time is mandatory [citations], and that such motions not timely filed are properly denied [citations], the time limitation applies to the defendant. The trial court still retains jurisdiction after 30 days from the entry of the verdict because the final judgment in a criminal case is the pronouncement of sentence." *People v. Talach*, 114 Ill. App. 3d 813, 818 (1983).

The State argues that the trial court could not consider the motion because it was filed after sentencing. A close reading of *Talach* shows that the court did not necessarily establish the date of sentencing as an arbitrary cutoff date. Instead, the court merely held that a trial court may consider an untimely posttrial motion so long as the court retains jurisdiction over the cause. Here, the trial court clearly retained jurisdiction when it denied the *pro se* motion because defendant's motion to reduce the sentence was pending. For this reason, this cause is distinguishable from *People v. Barry*, 202 Ill. App. 3d 212, 215-16 (1990), where there apparently was no pending postsentencing motion that preserved the trial court's jurisdiction to rule on an untimely posttrial motion filed after sentencing.

The State asks us to affirm the trial court's ruling because the *pro se* motion was untimely. The problem is that the trial court did not deny the motion as untimely. Instead, the court considered the motion and denied it as cumulative. Giving the trial court the discretion to entertain an untimely motion for a new trial when the court retains jurisdiction on other grounds comports with the purpose of the Code of Criminal Procedure of 1963 (725 ILCS 5/100—1 *et seq.* (West 2002)) to provide an orderly process for the review of claims that alleviates delay and expense to the judicial system. *Harper*, 347 Ill. App. 3d at 503. Given the nature of defendant's *pro se* claims, we are reluctant to rely on the untimeliness of the motion where the trial court never did so. Accordingly, we reject the State's argument and consider the merits of defendant's contention.

When a defendant files a *pro se* motion arguing that his trial counsel was ineffective, the trial court should conduct a preliminary investigation to determine whether the defendant's claim is valid. *People v. Cabrales*, 325 Ill. App. 3d 1, 5 (2001). After this examination, if the trial court finds that the claim lacks merit or pertains only to matters of trial strategy, then new counsel need not be appointed and the *pro se* motion can be denied. *People v. Robinson*, 157 Ill. 2d 68, 86

(1993). If, however, the allegations show possible neglect of the case, then the court should appoint new counsel. *People v. Bull*, 185 Ill. 2d 179, 210 (1998).

When conducting the preliminary investigation, the trial court at a minimum must afford the defendant an opportunity to specify and support his complaints. *People v. Cummings*, 351 Ill. App. 3d 343, 351 (2004). Additionally, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing whether any further action is warranted. *People v. Moore*, 207 Ill. 2d 68, 78 (2003). Also, the trial court may base its evaluation of the defendant's allegations on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face. *Moore*, 207 Ill. 2d at 79.

■ Here, the trial court summarily denied defendant's ineffective assistance of counsel claims without first conducting a preliminary examination of the claims. We note that the trial court was not in a position to evaluate all of the ineffective assistance claims simply by relying on facts within its knowledge. See *People v. Coleman*, 158 Ill. 2d 319, 351-52 (1994). For example, the claim that defense counsel failed to call Holley would require at least a brief inquiry into the potential substance of Holley's testimony and why counsel was unable to secure her presence or obtain a stipulation. Because the trial court did not conduct a preliminary investigation, we must remand the cause for that purpose. *Robinson*, 157 Ill. 2d at 86.

## IV. CONCLUSION

We affirm the trial court's decision to admit the victim's statements as dying declarations but must remand the cause for a further hearing on defendant's *pro se* posttrial motion challenging trial counsel's performance.

Accordingly, the judgment of the circuit court of Kane County is affirmed in part, reversed in part, and remanded.

Affirmed in part and reversed in part; cause remanded.

O'MALLEY, P.J., and BOWMAN, J., concur.