# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-400


**STATE OF LOUISIANA**

**VERSUS**

**JOSEPH T. PLAUCHE**


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 08-010MH(AVOYELLES PARISH
HONORABLE MARK A. JEANSONNE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*


## JOHN D. SAUNDERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*


Court composed of Sylvia R. Cooks, John D. Saunders, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

**Kathrine Sara Williamson**
**Attorney At Law**
**P.O. Box 1470**
**Alexandria, LA 71309**
**(000) 000-0000**
**Counsel for Defendant/Appellant:**
**Joseph T. Plauche**


**James Michael Small**
**Attorney at Law**
**P. O. Box 1470**
**Alexandria, LA 71309**
**(318) 487-8963**
**Counsel for Defendant/Appellant:**
**Joseph T. Plauche**

**Hon. Charles A. Riddle  III**
**District Attorney, 12th JDC**
**P. O. Box 1200**
**Marksville, LA 71351**
**(318) 253-6587**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Daniel James Stanford**
**Attorney at Law**
**117 Caillouet Place**
**Lafayette, LA 70501**
**(337) 232-2272**
**Counsel for Defendant/Appellant:**
**Joseph T. Plauche**

**SAUNDERS, Judge**

**FACTS AND PROCEDURAL HISTORY:**

On May 31, 2007, the Defendant, Joseph T. Plauche, shot his wife in the neck and then turned the gun on himself. The victim died about thirty-five hours after the shooting, but the Defendant recovered from his injuries and was charged for the shooting death of his wife.

On July 26, 2007, the Defendant was indicted by an Avoyelles Parish Grand Jury with second degree murder, a violation of La.R.S. 14:30.1. A motion to change venue was granted and the case was transferred to Concordia Parish. A trial by jury began on July 14, 2008. The trial concluded on July 24, 2008, and the jury unanimously found the Defendant guilty of the responsive verdict of manslaughter.

The Defendant filed a motion for a new trial which was taken up prior to sentencing on August 20, 2008. Following the trial court's denial of the motion, the Defendant was sentenced to serve forty years at hard labor. The Defendant filed a motion to reconsider sentence on September 15, 2008, which was denied with written reasons on March 20, 2009.

The Defendant is now before this court on appeal, challenging his conviction and sentence in seven assignments of error. For reasons discussed below, we affirm both the conviction and the sentence.

**APPELLANT'S ASSIGNMENTS OF ERROR:**

1.  The trial court erred in finding that no *Batson* violation occurred during voir dire and in denying the motion for mistrial raising the *Batson* issue.

2.  The trial court erred in denying the defense challenge for cause of prospective juror McMillin.

3.  The trial court erred in granting the State's motion in limine and allowing the use of hearsay evidence.

4. The trial court erred in denying the defense motions to suppress the physical evidence.

5. The trial court erred in allowing the State to introduce highly prejudicial irrelevant evidence.

6. The trial court erred in denying a mistrial after contact between a member of the prosecutor's staff and jurors.

7. The trial court erred in imposing a constitutionally excessive sentence and in denying the defense motion to reconsider the sentence.

**LAW AND DISCUSSION ON THE MERITS:**

ASSIGNMENT OF ERROR NO. 1:

By this assignment of error, the Defendant argues that the State used a peremptory challenge to excuse a prospective juror, Tammy Gorham, a black female, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986) and La.Code Crim.P. art. 795. The Defendant contends that a number of white prospective jurors, namely Gregory Booth, Louise Moak, Gregory Beard, and Gilbert McMillin, were similarly situated to Ms. Gorham in terms of hardship or extreme inconvenience if chosen to serve on the jury. As such, the Defendant concludes that the State's reason for excusing Ms. Gorham, in light of the fact that all of the State's previous peremptory challenges were used to excuse black potential jurors and because similarly situated white potential jurors were not peremptorily challenged by the State, appears to be a pretext for excusing Ms. Gorham, another potential black juror.

In *State v. Anderson*, 06-2987, pp. 41-43 (La. 9/9/08), 996 So.2d 973, 1004, *cert. denied*, ___U.S.___, 129 S.Ct. 1906 (2009), the Louisiana Supreme Court restated the well-settled law regarding jury selection and the appellate review of rulings on *Batson* challenges:

2

In *Batson* [*v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) ], the Supreme Court held that an equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of a person's race. The Supreme Court reaffirmed its position that racial discrimination by any state in jury selection offends the Equal Protection clause of the 14th Amendment in *Miller-El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Louisiana law codifies the *Batson* ruling in LSA-C.Cr.P. art. 795. *See also State v. Snyder*, 1998-1078 (La.9/6/06), 942 So.2d 484, rev'd on other grounds, *Snyder v. Louisiana*, 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).

If the defendant makes a prima facie showing of discriminatory strikes, the burden shifts to the state to offer racially-neutral explanations for the challenged members. If the race-neutral explanation is tendered, the trial court must decide, in step three of the *Batson* analysis, whether the defendant has proven purposeful discrimination. The race-neutral explanation need not be persuasive or even plausible. *Rice v. Collins*, 546 U.S. 333, 126 S.Ct. 969, 973-974, 163 L.Ed.2d 824 (2006), quoting *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). It will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The ultimate burden of persuasion as to racial motivation rests with, and never shifts from, the opponent of the peremptory challenge. *State v. Tyler*, 97-0338, at 3 (La.9/9/98), 723 So.2d 939, 942, *cert. denied*, 526 U.S. 1073, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999).

The trial court's findings with regard to a *Batson* challenge are entitled to great deference on appeal. *Id*. at 4; see also, *State v. Juniors*, 03-2425, p. 28 (La.6/29/05), 915 So.2d 291, 316. When a defendant voices a *Batson* objection to the State's exercise of a peremptory challenge, the finding of the absence of discriminatory intent depends upon whether the trial court finds the prosecutor's race-neutral explanations to be credible. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El*, 537 U.S. at 339, 123 S.Ct. at 1040.

The three-step *Batson* process which guides the courts' examination of premeptory challenges for constitutional infirmities has recently been described again by the Supreme Court as follows:

A defendant's *Batson* challenge to a peremptory strike requires a three-step inquiry. First, the trial court must

3

determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Internal quotations and citations omitted.]

*Collins*, 546 U.S. at 338, 126 S.Ct. at 973-74.

Prior to jury selection in the instant case, the trial court questioned potential jurors who sought to be excused. Gorham, a black female and student nurse, informed the trial court that she could only miss ten percent of class time during the semester. She admitted that her absence from class would be excused, but she would, nonetheless, be required to make up the time. The trial court denied Ms. Gorham's request to be excused at that time.

During voir dire, Ms. Gorham stated that she was a nursing student at Our Lady of the Lake in Baton Rouge, Louisiana. She explained that she was enrolled in a four semester program to become a licensed practical nurse. Ms. Gorham reported that she was in her second semester, which on a weekly basis involved two days of class time, 8:00 a.m. to 4:00 p.m., and three days of clinicals, 6:30 a.m. to 3:00 p.m. According to Ms. Gorham, she had only two weeks remaining in the semester and had already missed two clinical days. Ms. Gorham testified that serving on the jury would be a sacrifice because she was required to complete a certain number of hours and without

4

the requisite hours, she would have to repeat the semester. Also, she would have to wait until the class was offered again. The State did not challenge Ms. Gorham for cause based on her hardship and she was later accepted as a prospective juror by both the State and Defendant.

At some time thereafter, the State asked the Defendant to join in a challenge for cause to excuse Ms. Gorham due to her hardship and the Defendant declined. Following a short break, jury selection resumed and the State exercised its fourth peremptory challenge to remove Ms. Gorham based on significant hardship. Ms. Gorham was subsequently dismissed from the panel.

Prior to the commencement of jury selection the following day, the Defendant filed a motion for mistrial based upon an alleged *Batson* violation involving the peremptory challenge of Ms. Gorham. The Defendant complained that the State had used four peremptory challenges at that time and that all four challenges were used to excuse black jurors, including Ms. Gorham. Referring the trial court to *Snyder v. Louisiana*, 552 U.S. 472, 128 S.Ct. 1203 (2008), the Defendant argued that the reason for challenging Ms. Gorham was not race neutral. According to the Defendant, similarly situated white prospective jurors, including Greg Beard, Gregory Booth, Gilbert McMillin and Louise Moak, were not excused for hardship, nor did the State remove these prospective jurors for cause or peremptorily.

In *Snyder*, the State dismissed a juror, Mr. Brooks, because it felt that he would be overly concerned with being absent from his student teaching assignment and possibly motivated to find the defendant guilty of a lesser included offense to avert a penalty phase. In finding the State's reasons implausible, the court noted that Mr. Brooks was one of more than fifty potential jurors expressing concern that jury

5

service would unduly interfere with their lives, some to an extent greater than Mr. Brooks, and those jurors were not dismissed by the State. More importantly, the State dismissed Mr. Brooks despite the fact that court personnel contacted the university and had obtained reassurances that it would work with Mr. Brooks so that he could complete his student teaching assignment satisfactorily.

In the instant case, the State stressed at trial that when Ms. Gorham was initially questioned, she indicated that she could not finish the semester if she missed more than ten days. The trial court did not excuse her at that time, indicating that her alleged hardship would be addressed more thoroughly during voir dire. During voir dire, Ms. Gorham indicated that she would not only lose the time spent in her present semester, she would not be able to proceed to the next semester because she would have to make up the lost semester, a predicate semester. Essentially, Ms. Gorham would lose two semesters. The State asserted that Ms. Gorham's situation was easily distinguished from those of the individuals identified by the Defendant.

Both the Defendant and the State addressed the prospective jurors named by the Defendant in his motion. With respect to Greg Beard, the Defendant pointed out that Mr. Beard was going through a divorce and had to pick up and transport his children. As noted by the State, however, Mr. Beard had the option of communicating with his wife who could pick up the children. Accordingly, the State asserted that Mr. Beard's hardship was not comparable to that of Ms. Gorham.

Next, the Defendant focused on Gregory Booth. Mr. Booth indicated that he was an EMT and that his possible two-week absence would, in his opinion, endanger the health and welfare of people in the area due to the shortage of EMTs. The State observed, however, that Mr. Booth's supervisor was covering for him. The State

6

argued that the inconvenience caused to Mr. Booth and his supervisor was in no way similar to the hardship faced by Ms. Gorham. The State also noted that Mr. Booth was ultimately excused for cause after having stated he had a strong proclivity to the favor the prosecution because of his career.

The Defendant also pointed to Gilbert McMillin, an offshore worker due to leave for a fourteen-day stint. If he was not able to report to work as scheduled, Mr. McMillin would be required to work twenty-eight days straight. He was ultimately excused by the defense with a peremptory challenge because the Defendant did not want an unfair juror. The State pointed out that Mr. McMillin was able to call someone to relieve him, whereas Ms. Gorham had no options at her disposal. As such, the State argued that their situations were in no way similar.

Lastly, Louise Moak's husband had major heart problems and had medical appointments scheduled. She was not excused by the trial court nor did the State move to excuse her for cause or peremptorily based on hardship and was still on a jury panel. The State pointed out, however, that Mrs. Moak had children who could go with Mr. Moak to his appointments, if necessary.

In denying the Defendant's motion, the trial court stated that its first impression of Ms. Gorham's situation was that she would be able to complete the semester after a two-week delay. The trial court then learned that in addition to losing the semester, she would be unable to start the subsequent semester as scheduled. At that point, the trial court felt that the hardship was significant and it would be an unreasonable request of the court to keep her on the jury. The trial court also compared Ms. Gorham's situation with other potential jurors identified by the Defendant–finding their hardships distinguishable from that of Ms. Gorham.

7

On appeal, the State addresses the *Batson* three-step inquiry. With regard to the first inquiry, the State refers to *State v. Juniors*, 03-2425 (La. 6/29/05), 915 So.2d 291, *cert. denied*, 547 U.S. 1115, 126 S.Ct. 1940 (2006), wherein the court held that the use of four out of five peremptory challenges against blacks alone did not establish a discriminatory pattern. As such, the State maintains that the use of three peremptory challenges prior to Ms. Gorham did not establish a racial pattern.

As to the second inquiry, the State maintains that the record contains race-neutral reasons for the peremptory challenges before Ms. Gorham. The State argues that the three peremptory challenges used to excuse Steve Fair, Cherlyn Dye, and Troy Mellon were not based on race. The State initially challenged Mr. Fair for cause, arguing that Mr. Fair would require extra proof to return a guilty verdict if a life sentence was involved. The Defendant objected, arguing that the State had to use a peremptory challenge because Mr. Fair indicated that he would base his decision on the evidence presented, regardless if a life sentence was involved.

Ms. Dye was also first challenged for cause by the State because Ms. Dye stated that she would want to know the Defendant's motive although the State was not required to prove motive. The Defendant objected because Ms. Dye also indicated that she could find the Defendant guilty if the State proved beyond a reasonable doubt that the Defendant killed the victim by firing a shot with the intent to kill or inflict great bodily harm, even if motive was not addressed by the State. The trial court denied the challenge for cause and the State followed with its second peremptory challenge.

8

Unlike Mr. Fair and Ms. Dye, Troy Mellon was initially accepted as a juror. Mr. Mellon, however, was observed sleeping throughout the proceedings and the State exercised a peremptory challenge as a back strike.

As to the third inquiry, the State contends that purposeful discrimination was not involved in its peremptory challenges. The State argues, first, that the factual situation of the instant case is distinguishable from *Snyder*. The State correctly asserts that the black defendant in Snyder was convicted by an all-white jury after the State peremptorily excused all five prospective black jurors. In the instant case, however, the record reflects that the Defendant, a white male, was convicted by a jury composed of seven white and five black jurors, with two of the three alternate jurors being black. Also, the State argues that the reason cited in *Snyder* for the peremptory challenge of Mr. Brooks, his concern about missing school, was eliminated by the trial court with a call to the Mr. Brooks' school to confirm that there would be no problem for him to miss class and that the lost time could be made up without incurring any penalty.

The State also refers to the trial court's observation of the prosecutors' demeanor and the court's conclusion that it did not evidence a racially discriminatory intent. The trial court stated that it had evaluated the prosecutors' credibility and that it did not believe that anyone's demeanor showed any discriminatory intent. In comparing Ms. Gorham's hardship to those of other prospective jurors who were not excused, the State noted, first, that the race of Mr. Booth, Mrs. Moak, and Mr. Beard were not included in the record. Also, Mr. Booth and Mrs. Moak were never accepted as jurors as they were both excused for cause and the State exercised a back strike to exclude Mr. Beard.

9

Although the State's first four peremptory challenges were used to dismiss potential black jurors, we find that the State presented a race-neutral explanation for exercising a peremptory challenge to remove Ms. Gorham from the jury and that the challenge did not involve purposeful discrimination. The hardships expressed by the white prospective jurors whom the Defendant claims were similarly situated but were not excused for hardship pale in comparison to the sizeable hardship faced by Ms. Gorham. Additionally, the trial court observed the State's demeanor and there is no evidence in the record to suggest that it evidenced a racially discriminatory intent.

Lastly, unlike the black defendant in *Snyder* who was tried by an all white jury, the white Defendant herein was tried by a jury composed of seven white and five black jurors and one white and two black alternate jurors. As such, we find that there was no evidence to suggest that the State was seeking to obtain an all-white or predominately-white jury. Also, the trial court in *Snyder* resolved the juror's conflict by calling the dean of the juror's school, who confirmed that there would be no problem for the juror to miss class while serving on the jury.

Considering the facts presented, we find that the trial court's determination of credibility should not be disturbed on appeal without any evidence or suggestion in the record that the State's exercise of its peremptory challenges were racially motivated. Accordingly, we find that this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2:

By this assignment of error, the Defendant argues that the trial court erred in denying the defense challenge for cause of prospective juror McMillin. The Defendant maintains that Mr. McMillin demonstrated he could not be fair and impartial, establishing grounds for a challenge for cause pursuant to La.Code Crim.P.

10

797. The Defendant complains that he was forced to use a peremptory challenge to remove Mr. McMillin from the jury, exhausting his peremptory challenges.

In support of his argument, the Defendant refers to *State v. Monroe*, 366 So.2d 1345, 1347 (La.1978), wherein the court stated,

> Where an accused has exhausted all of his peremptory challenges before completion of the panel, he is entitled to complain on appeal of a ruling refusing to maintain a challenge for cause made by him. *State v. Qualls*, 353 So.2d 978 (La.1977); *State v. Ballard*, 337 So.2d 481 (La.1976). The trial judge is vested with broad discretion in ruling on a challenge for cause which ruling will not be disturbed on appeal absent a showing of abuse of that discretion. *State v. Drew*, 360 So.2d 500 (La.1978). In *State v. Breedlove*, 199 La. 965, 7 So.2d 221 (1942), this court held that three requirements were necessary before the ruling of a trial judge refusing to sustain a defendant's challenge for cause constituted reversible error: (1) an erroneous ruling refusing to sustain the defendant's challenge for cause; (2) exhaustion of all of the defendant's peremptory challenges; and (3) the defendant was forced to accept an obnoxious juror, either the one that should have been excused for cause, or, if the juror was peremptorily challenged, a subsequent juror that defendant would have peremptorily challenged but for the fact that he had already exhausted his peremptory challenges. Chief Justice O'Neill strongly dissented.

According to the Defendant, Mr. McMillin's answers on voir dire indicated that he could not pay attention to the court proceedings and that he could not presume the innocence of the Defendant, especially if he did not testify, and would favor the testimony of police.

The record reflects that Mr. McMillin, an offshore barge engineer, was first questioned by the State. Mr. McMillin stated that his "relief" person had to stay over so that he could be present for jury selection. When asked if the situation would leave a bad taste in his mouth regarding his ability to listen to all of the evidence and follow the law, Mr. McMillin responded, "It don't help any" and indicated that he would be affected because he needed to be at work rather sitting on the jury.

11

At the outset of questioning by the defense, Mr. McMillin stated that he could not vote yet for either side without having first heard the evidence. Mr. McMillin also indicated that people in this country who are accused of a crime deserve a fair trial and that he expected defense counsel to represent the Defendant to the best of his ability within the boundaries of the law and ethics.

When Mr. McMillin was questioned about missing work, he testified that he and his family would not sustain any financial hardship. Mr. McMillin, however, expressed his concern about having to "work over" to make up the time he missed.

Mr. McMillin also indicated that if he had heard all the evidence and was convinced that the shooting was an accident, he could vote "not guilty." Also, if after hearing all the evidence and the case was a close case, Mr. McMillin stated that "[Y]ou got to vote your conscience" and weigh the evidence. Mr. McMillin stated that he would not push the evidence aside and go with his gut feeling in making his decision. Again, if there were two witnesses, a police officer and a lay person, he would tend to give more weight to the police officer because the police officer is supposed to be a professional.

Lastly, Mr. McMillin was asked if he would hold it against the Defendant if he decided not to testify. Mr. McMillin responded, "That's the law," and stated he had to follow the law in the courtroom, even though the Defendant may look a little more guilty. Mr. McMillin also indicated that if he was chosen, he would examine his views, discuss the evidence and facts with the other jurors with a view toward reaching a fair and just verdict, although he was a bit "hardheaded."

In making his argument for dismissing Mr. McMillin for cause, the Defendant argued that on two separate occasions, Mr. McMillin indicated that he would give

more weight to the testimony of a police officer than a non-police officer witness. Because there would be direct conflicts between testimony of police officers and non-police officers, the Defendant maintained that Mr. McMillin should be dismissed for cause. The Defendant also referred to Mr. McMillin's hardship excuse. Because he would have to work twenty-one to twenty-eight days to make up time he had missed, Mr. McMillin stated that his mind would be distracted during trial and interfere with his ability to listen to the evidence.

In denying the dismissal of Mr. McMillin for cause, the trial court noted that it was initially concerned about Mr. McMillin, but observed that he was rehabilitated, possibly unwillingly. As time went on, the trial court was reassured by Mr. McMillin's responses that he would follow the law, albeit not a perfect juror with some reluctance on his part to serve as a juror. The trial court opined that Mr. McMillin could follow the law at a competent level to the benefit of both parties.

Mr. McMillin's tendency to rely on the testimony of a police officer appears to be rooted in the professional status of police officers, in general, and his respect for decisions made by police officers in that capacity. The trial court did not err in concluding that Mr. McMillin could be fair and impartial in determining the credibility of a police officer witness.

Considering the record of voir dire, we find that the Defendant has not shown that Mr. McMillin could not pay attention to the court proceedings and could not presume the Defendant's innocence. Although Mr. McMillin initially expressed that the thought of working an extended number of days to make up time missed at work would be distracting, he did not testify that he was unable to pay attention to the court

13

proceedings.  Further, as noted by the trial court, Mr. McMillin's responses as voir dire progressed essentially rehabilitated any concerns he originally expressed.

Without a showing that Mr. McMillin was unable to pay attention, that he could not presume the Defendant's innocence and that he would at all times favor the testimony of a police officer, we find that this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 3:

By this assignment of error, the Defendant argues that the trial court erred in granting the State's motion in limine and allowing the use of hearsay evidence.  The Defendant maintains that the victim's statements to police and an EMT did not fall within the dying declaration exception to the hearsay rule.

Prior to trial, the State filed a "Motion for In Limine Ruling and to Establish Voir Dire Procedures" seeking an in limine ruling on the admissibility of statements made by the victim to Michael Bell, a Marksville City patrolman, David Dauzat, a Louisiana State Police trooper, and Todd Simon, an EMT with Acadian Ambulance, indicating that the Defendant had shot her.  An evidentiary hearing was held on the motion, and the motion was subsequently granted.

In its reasons for granting the State's motion, the trial court noted that a victim need not express an awareness of impending death, nor must a dying declaration be spontaneous.  A dying declaration could be in response to questions.  The trial court referred to *State v. Gremillion*, 542 So.2d 1074 (La.1989), which held that the victim's sense of impending death rests on an evaluation of her subjective experience with the pivotal question of what the declarant believed as to her physical condition.  The trial court concluded that the victim was aware of the magnitude, severity, and significance of her injury.

14

In addition to finding that the victim's statement was admissible as a dying declaration, the trial court ruled that the statement was admissible as an excited utterance exception to the hearsay rule. The trial court referred to the definition of an excited utterance, a statement describing an event or condition made while the declarant was perceiving the event or condition or immediately thereafter, and which is admissible as a present sense impression. The trial court stated that the main factor to be considered regarding an excited utterance is whether enough time has elapsed since the start of the event for the person to reflect and to fabricate a story.

The Defendant sought a writ of review in this court, which was subsequently denied. *State v. Plauche*, an unpublished writ bearing docket number 08-225 (La.App. 3 Cir. 2/29/08). The ruling reads, in pertinent part:

> Further, the trial court did not err in finding the victim's statement a dying declaration and that it is admissible at trial, notwithstanding the holding in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004). The magnitude of the victim's injury, the circumstances surrounding the declarations, and the victim's death establish an inferential basis for finding that the victim was in fact, and believed herself to be, near death. *State v. Verrett*, 419 So.2d 455 (La.1982); *State v. Nicholson*, 96-2110 (La.App. 4 Cir. 11/26/97), 703 So.2d 173, *writ denied*, 98-14 (La. 5/1/98), 805 So.2d 200. Thus, the victim's dying declaration is admissible at the Defendant's trial. *See People v. Monterroso*, 101 P.3d 956 (Cal. 2004), *cert. denied*, 546 U.S. 834, 126 S.Ct. 61 (2005); *State v. Martin*, 695 N.W.2d 578 (Minn. 2005); *People v. Gilmore*, 828 N.E.2d 293 (Ill.App. 2 Dist. 2005), *appeal denied*, 839 N.E.2d 1030 (Ill. 2005); *State v. Young*, 710 N.W.2d 272 (Minn. 2006); *State v. Lewis*, 235 S.W.3d 136 (Tenn. 2007).

The Louisiana Supreme Court denied writs on March 4, 2009. *State v. Plauche*, 08-484 (La. 3/4/08), 977 So.2d 895.

As noted by this court in *State v. Schmidt*, 99-1412, p. 38 (La.App. 3 Cir. 7/26/00), 771 So.2d 131, 152, *writ denied*, 00-2950 (La. 9/28/01), 798 So.2d 105, *cert. denied*, 535 U.S. 905, 122 S.Ct. 1205 (2002), *State v. Hebert*, 97-1742, p. 9 (La.App. 3 Cir. 6/3/98), 716 So.2d 63, 67-68, *writ denied*, 98-1813 (La. 11/13/98),

15

730 So.2d 455, *cert. denied*, 529 U.S. 1072, 120 S.Ct. 1685 (2000), "It is now well-settled that a defendant may, once again, seek review of a pretrial ruling by the trial court even after the denial of a pretrial supervisory writ application seeking review of the same issue." Additionally:

> The prior denial of supervisory writs does not bar reconsideration of an issue on appeal, nor does it prevent the appellate panel from reaching a different conclusion. *State v. Fontenot*, 550 So.2d 179 (La.1989); *State v. Decuir*, 599 So.2d 358 (La.App. 3rd Cir.1992), *writ denied*, 605 So.2d 1095 (La.1992). When a defendant does not present any additional evidence on this issue after the pre-trial ruling, the issue can be rejected on appeal. *See, e.g., State v. Regan*, 601 So.2d 5 (La.App. 3rd Cir.1992), *writ denied*, 610 So.2d 815 (La.1993); *State v. Wright*, 564 So.2d 1269 (La.App. 4th Cir.1989). Judicial efficiency demands that this court accord great deference to its pre-trial decision unless it is apparent that the determination was patently erroneous and produced unjust results. *State v. Decuir*, *supra*, at 360.

*Hebert*, 716 So.2d 63, 67-68, quoting *State v. Magee*, 93-643, p. 2 (La.App. 3 Cir. 10/5/94), 643 So.2d 497, 499. As such, the alleged error is considered herein.

Louisiana Code of Evidence Article 804, in pertinent part, provides:

> B. Hearsay exceptions.   The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (2) Statement under belief of impending death. A statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.

At the hearing on the State's motion in limine, Simon, James Soileau, a paramedic with Acadian Ambulance, Sergeant Bell, Trooper Dauzat and Dr. L.J. Mayeux, the Avoyelles Parish Coroner, testified about the statements made by the victim and the circumstances surrounding same. Mr. Simon and Sergeant Bell also testified at trial, along with Dr. Joel Carney, a forensic pathologist.

16

On appeal, the Defendant refers, again, to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004), wherein the State sought to introduce a recorded statement of the defendant's wife made during police interrogation as evidence that the crime committed was not in self-defense. The defendant was being prosecuted for stabbing a man who allegedly tried to rape his wife. The wife did not testify at trial because of the marital privilege. The Court concluded that the State's use of the statement violated the Confrontation Clause because "[t]he only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id*. at 1374. Although the Court did not decide whether an exception was incorporated into the Confrontation Clause, in footnote six, the Court observed that a dying declaration was an exception to general hearsay rule.

In addition to *Crawford*, the Defendant now refers to *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266 (2006) and *Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22 (1933). In *Davis*, the victim called 911 to report that she had been assaulted by the defendant, her former boyfriend, in violation of a domestic no-contact order. In lieu of her testimony at trial, the State submitted the 911 recording and an affidavit of the victim obtained when she was interrogated. The Supreme Court held that the victim's statements in response to the 911 operator's interrogation were not testimonial. Comparing the facts to *Crawford*, the Supreme Court found that the victim was speaking of events as they were happening as opposed to an interrogation that took place several hours after crime. The Supreme Court also observed that the victim was facing an ongoing emergency and that her statements were necessary to enable the police to resolve the emergency at hand. On the other hand, the victim's written statements in an affidavit given to police officers during the interrogation

17

following the crime were found to be testimonial because the circumstances objectively indicated that there was no ongoing emergency and the primary purpose was to establish or prove past events potentially relevant to subsequent criminal prosecution.

In *Shepard*, 290 U.S. 96, the defendant was convicted of murdering his wife by poisoning her with bichloride of mercury. Under the dying declaration exception, the prosecution sought to introduce evidence of a conversation between the victim and her nurse wherein the victim reported to the nurse that her husband had poisoned her. The Supreme Court ruled that the victim was "not shown to have spoken without hope of recovery and in the shadow of impending death." *Id*. at 99. The victim's conversation with the nurse occurred two days after she became ill and after her thought and speech processes became rational and orderly. At the time of her statement, neither the victim nor her physicians believed that she was critically ill or that her recovery was hopeless. A week later, the victim relapsed and developed an infection in her mouth, congestion in her eyes and hemorrhaging of her bowels. She died twenty-four days after implicating her husband during the conversation with her nurse.

The Defendant also refers for the first time to *Giles v. California*, __ U.S. __, 128 S.Ct. 2678 (2008), wherein the defendant was convicted of the first degree murder of his former girlfriend. At the defendant's trial, the State introduced statements made by the victim to a police officer responding to a domestic violence report about three weeks prior to her murder indicating that she had been physically assaulted by the defendant and that he had threatened to kill her. Over the defendant's objection, the statements were admitted under the California Supreme

Court's theory of forfeiture by wrongdoing that permits the introduction of out-of-court statements when the witness is detained or kept away by means or procurement of the defendant. The United States Supreme Court, however, found that the doctrine was not an exception to the Confrontation Clause because it was not established at the time the Bill of Rights were founded or in subsequent jurisprudence.

Although the issue in *Giles* is not relevant to the instant case, the Defendant refers to the dissenting opinion of Justice Breyer, with whom Justices Stevens and Kennedy joined, wherein Justice Breyer addressed the dying declaration exception to the Confrontation Clause and the lack of jurisprudential support for the majority's conclusion. Justice Breyer wrote, "A dying declaration can come into evidence when it is 'made in extremity' under a sense of impending death, 'when every hope of this world is gone: when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth.'" *Id*. at 2704 (citations omitted). The dissent, however, provides no other guidance with regard to the requirements of a dying declaration.

Relying on *Giles*, the Defendant argues that there is no evidence in the record to indicate that the victim believed that her death was imminent. On the contrary, the Defendant contends that the record contradicts such a claim. The Defendant contends that while the victim may have been on the brink of death at the time she was questioned, there is no evidence to prove that she was aware that she was dying. The Defendant stresses that the focus should be on the victim's belief as to her physical condition, not her actual condition.

In further support of his argument, the Defendant cites two Louisiana Supreme Court cases that speak to the definition of a dying declaration, *Garza v. Delta Tau*

19

*Delta Fraternity*, 05-1508, 05-1527 (La. 7/10/06), 948 So.2d 84 and *State v. Gremillion*, 542 So.2d 1074 (La.1989). In *Garza*, the court found that a suicide note explaining the reasons for the victim's decision to commit suicide was not admissible in a wrongful death action alleging that the negligence of the defendant was the proximate cause of her death. Even though the victim hung herself within a day of writing the note and she hung herself subsequent to the declaration, the court concluded that the timing of death was totally within her control and that her statement that death was imminent was self-serving and lacking in any recognized motivation to tell the truth. Further, the court noted that the victim retained the ability to draft a statement to her liking, that accusations of others contained in the note were tainted with possible motives of self-exoneration, and that she was not subjected to cross-examination.

In *Gremillion*, 542 So.2d at 1077-8, the court stated, "Dying declarations are admissible if made when the declarant is fully conscious of his condition and under a sense of impending death, after having abandoned all hope or expectancy of recovery. *State v. Unger*, 362 So.2d 1095 (La.1978)." The defendant in *Gremillion* attempted to introduce the victim's statement made to an investigating police officer who interviewed the victim the day he was admitted to the hospital following an altercation with the defendant. In his statement, the victim was unable to identify his attackers. Although the defendant was in great pain at the time he made his statement, the court found that he was not aware of his impending death which did not occur until seventeen days later and after two surgeries.

The State refers this court to several Louisiana decisions which interpret the hearsay exception of a dying declaration in Article 804(B)(2). In *State v. Martin*, 562

20

So.2d 468 (La.App. 5 Cir.), *writ denied*, 566 So.2d 987 (La.1990), the trial court admitted as dying declarations the statement of an investigating police officer taken from the victim and a recording of a 911 call made by the victim which implicated the defendant. On appeal, the defendant argued that the victim's testimony was not a dying declaration because there was no evidence that the victim knew he was going to die. The court held that a declarant need not express his belief in direct terms that he going to die. Instead, "[t]he required state of mind may be inferred from the course of events leading up to the making of the declaration and other pertinent considerations." *Id*. at 471.

In *State v. Verrett*, 419 So.2d 455 (La.1982), the victim was stabbed in the heart at his residence and then staggered to a nearby coffee shop where he reported to the owner that the defendant had tried to rob him. The statement was also witnessed by a cook and a waitress. The victim died minutes later. In finding that the victim's statement was admissible, even though it was elicited by questions, the court stated:

> We do not believe that it is sacramental that the victim declare that he feels the end is near if such belief may be reasonably presumed from the facts and circumstances surrounding the declaration. In this connection we note, as a reasonable conclusion, that the more serious the injury and impairment of the declarant's physical condition, the more probable is his belief that the end is near.

*Id*. at 457 (citations omitted). Significant facts considered by the court in reaching its conclusion were the victim's fatal wound to the heart, his deteriorating condition as he entered the café, his death within five minutes of making the statement, and the amount of blood between the café and his residence.

In *State v. Lucas*, 99-1524 (La.App. 1 Cir. 5/12/00), 762 So.2d 717, the defendant was convicted of second degree murder. The trial court allowed into

21

evidence as dying declarations the victim's statements concerning the identity of the defendant as his assailant and the vehicle driven by the defendant. The testimony at trial indicated that the victim arrived at the hospital unresponsive and covered in blood as the result of a gunshot wound through his lower chest. The victim was considered at that time to be in critical condition. Although he had a pulse, he was not breathing well on his own. After he was resuscitated, his condition improved significantly and he was taken to surgery about one and one-half hours later. Prior to surgery, the victim was questioned by officers concerning his knowledge of who had shot him. Speaking through an oxygen mask and struggling as he spoke, the victim identified the defendant as the perpetrator and the color and make of his car. The victim was aware that he was going to surgery. During surgery, the victim's heart stopped beating, but he was resuscitated again.

The court found no error in the trial court's ruling considering the magnitude of the victim's injury and the circumstances surrounding his declarations. The court concluded that the facts established "an inferential basis for finding that the victim was in fact, and believed himself to be, near death." *Id*. at 724 (citations omitted).

The State concludes that the magnitude of the victim's injury, along with vomiting blood and lapsing into unconsciousness several minutes after her statement establishes an inferential basis that she was in fact, and believed herself to be, near death. With regard to the magnitude of her injury, the State refers to the aspiration of blood into the victim's lungs, the wounds to her carotid artery and jugular vein and the fracture of her spinal process. The State also refers to Exhibit 4B, a photograph taken of the victim which depicts how she was found at 12:40 a.m. following her

assault. The victim appears to have sustained a life-threatening injury as evidenced by her bloody body and her positioning on the ground.

The instant case presents a unique set of circumstances. The victim did not verbalize any feelings of impending death, yet she was mortally wounded, leaving the factfinder with the challenging task of determining whether she believed her death was imminent in light of the surrounding circumstances.

The factual scenarios in the jurisprudence cited by the Defendant are distinguishable from the facts and circumstances of the case at hand, yet provide some guidance.

Unlike the victims in *Gremillion*, 542 So.2d 1074 (died seventeen days later and after two surgeries) and in *Shepard*, 290 U.S. 96 (died twenty-four days after implicating her husband for poisoning her), the victim in the instant case lost consciousness soon after struggling to make her brief statement identifying her husband as the shooter. She then went into respiratory arrest, lost consciousness, and never spoke again. The following day, she was brain dead and expired after she was removed from life support, about thirty-five hours after the shooting.

The *Giles* decision, on the other hand, provides little assistance in determining whether the victim's statement herein would be considered a dying declaration. The issue in *Giles* was whether the victim's statement made three weeks prior to her murder was admissible under the California Supreme Court's theory of forfeiture by wrong doing, an alleged exception to the hearsay rule. Unlike the dying declaration exception, the Court declined to approve of such an exception.

Also, unlike the victim in *Gremillion*, 542 So.2d 1074, the victim herein lost consciousness soon after she identified her husband as the shooter, and no other

23

statements were made prior to her death thirty-five hours later. The evidence at the hearing and at trial indicated that as a result of her injury, the victim began to hemorrhage severely soon after giving her brief statement, that she was aware that she was critically injured, and that she could have anticipated or felt that she was in danger of dying. According to Dr. Mayeux, the victim was basically dead once she was en route to the hospital.

The facts of instant case are similar to those in *Verrett*, 562 So.2d 468, wherein the court found that the more serious the injury and impairment of the declarant's physical condition, the more probable was the declarant's belief that the end was near. In the instant case, the victim's airway had to be suctioned before she could speak clearly, and even then, her lungs were filling with blood while she awaited transport to the hospital. The victim went into full respiratory arrest and basically died en route to the hospital, shortly after the shooting and giving her brief statement to Sergeant Bell. From that point on, the victim's life was maintained with the assistance of life support until the time she was removed from life support at Rapides following the determination that she was brain dead. Considering the court's ruling in *Veret* and the facts and circumstances surrounding the victim's statement, the factfinder could reasonably presume that the victim felt that the end was near.

For these reasons, we find that there is no merit in this assignment of error as it relates to the trial court's granting of the State's motion in limine.

ASSIGNMENT OF ERROR NO. 4:

By this assignment of error, the Defendant argues that the trial court erred in denying his motion to suppress, which sought to suppress evidence seized by the police in a warrantless search in May 2007, and by subsequent searches pursuant to

24

warrants.  An evidentiary hearing was held on the motion at the same time the State's motion in limine was taken up, and the Defendant's motion was denied.

In denying the Defendant's motion, the trial court referred to the plain view doctrine and stated that prior justification for police intrusion into a protected area was a prerequisite for a legitimate plain view seizure.  With allegations of a shooting, the trial court ruled that the scenario created a prior justification for the intrusion. The second prerequisite for a legitimate plain view seizure, the trial court stated, is when the evidence is immediately apparent without close inspection.  Considering that when officers arrived, the Defendant was lying on his stomach in a pool of blood and the victim was within view, also lying in blood, the trial court found that the two prerequisites were clearly satisfied.

The trial court referred to State's Exhibit 3 which showed the Defendant lying in plain view in a pool of blood and State's Exhibit 6 which showed the victim lying on the floor in plain view.  A weapon is also seen in plain view not far from the victim's body.  The trial court noted some pipes around the weapon, but clarified that the pipes did not block the view of the weapon.

In reaching its decision, the trial court referred to *State v. Dowling*, 387 So.2d 1165 (La.1980), wherein the court found that a warrantless search and seizure was justified.  In *Dowling*, the court held that the plain view exception "allows evidence found and seized without a warrant to be used against defendant where: (1) there is a prior justification for police intrusion into a protected area; (2) the evidence is discovered inadvertently; (3) it is immediately apparent without close inspection that the items are evidence or contraband." *Id*. at 1169 (citations omitted).

Considering the ruling in *Dowling*, the trial court stated that it could find nothing to indicate that an intrusive search occurred and that the photographs were evidence that everything was in plain view. The trial court did not see any evidence or hear any testimony that boxes or pipes had to be moved about before a picture of the gun was taken.

The trial court then referred to *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408 (1978), wherein the legitimacy of warrantless entries and searches involving law enforcement officers responding to persons they reasonably believe were in need of immediate aid was addressed. In *Mincey*, an undercover officer was shot and killed and the defendant was wounded during a narcotics raid on the defendant's apartment. Shortly after narcotic officers secured the scene, homicide detectives arrived and proceeded to conduct an exhaustive and intrusive four-day warrantless search of the apartment. The Supreme Court held that the defendant did not forfeit his expectation of privacy in his home where the shooting occurred, nor did his arrest lessen his right of privacy to justify the search of his home. The Court also found that the seriousness of the offense, alone, did not present exigent circumstances to justify the search, especially in the absence of a life or limb threatening emergency. At the time of the search, everyone in the apartment at the time of the shooting had been located.

Relating *Mincey* to the instant case, the trial court noted that when officers initially found both the Defendant and victim wounded, it was reasonable for the officers to believe that a third person may be on the scene and pose a threat of harm. During the course of legitimate emergency activities, the officers could seize evidence in plain view. The trial court stated that the evidence seized at that time was near the area where the Defendant and victim were shot. The trial court also

26

acknowledged that a person's attempt to get medical assistance did not evidence a diminished expectation of privacy.

The trial court found, however, that the officers were justified in seizing the evidence under the plain view doctrine. In support of its conclusion, the trial court referred to *Thompson v. Louisiana*, 469 U.S. 17, 105 S.Ct. 409 (1984). In *Thompson*, the Supreme Court held that there was no murder scene exception to the warrant requirement and that a search without a warrant was not permissible for the sole reason that a homicide has occurred on the premises. The Supreme Court noted, however, that the seizure of evidence in plain view would be justified.

Captain Ellis Walker of the Marksville Police Department testified at the hearing and at trial. His testimony reflects that he was notified of the shooting at 12:37 a.m. and that he, Sergeant Bell, and two patrolmen arrived on the scene at 12:40 a.m. Captain Walker and a patrolman went to the front door while Sergeant Bell and a patrolman went around the house. Captain Walker stated that he was soon notified by radio that a white male was found around back, lying face down near the shed. The Defendant was then handcuffed and *Mirandized* by Sergeant Bell. Captain Walker noticed that shed door was open, and when he looked into the shed, he saw the victim lying on the floor.

After calling 911 for an ambulance and securing the perimeter, Captain Walker took several photographs and several items were seized. In addition to the evidence introduced at trial by the State, officers seized four .22 casings, a Nokia cell phone, a Memorex CD, a wood bench, a rolling chair, and a gunshot residue collection kit. The Defendant introduced the photograph of the wood bench which was taken at 12:46 a.m., and the actual cartridges, bullets, and cell phone.

27

Captain Walker testified that no one had touched the gun prior to the photograph and no objects were moved for him to visualize the gun. According to Captain Walker, the photograph of the gun depicts its location when he walked into the shed, approximately three to four feet from the victim's right shoulder. Also, the recorders that were photographed were found on a stool inside the shed, approximately two to three feet from the victim, and were not moved prior to the photograph.

When Assistant Chief John Augustine of the Marksville Police Department arrived, an ambulance was on the scene, tending to the victim, and the Defendant was sitting up on the ground on the sidewalk. He then entered the shed to speak to Captain Walker who directed him to where the victim and evidence had been found. Assistant Chief Augustine testified that he was not present when the photographs of the Defendant and victim were taken, including the photo of the victim wherein the gun can be seen. At 1:15 a.m., he began collecting the evidence that had been found and filling out the Evidence Record introduced into evidence by the Defendant as Exhibit D#6. As he collected each item, he would have Captain Walker take a photograph as he picked up the item.

Assistant Chief Augustine testified that he personally retrieved the gun and that the magazine with five rounds was still in the gun. Another unspent round was found on the ground along with four empty casings. According to Assistant Chief Augustine, the gun, magazine, rounds, and casings were all discovered without the necessity of moving anything and everything was in the general area. He maintained that the items were in plain view. After the Defendant was removed, Assistant Chief Augustine saw the cell phone and instructed Captain Walker to take a picture of the

28

phone so that he could collect it. The cell phone was not visible until the Defendant was moved and it was photographed within a few minutes of the Defendant's removal from the scene. Also, the cell phone was the last item collected by Assistant Chief Augustine. Within thirty minutes after retrieving the cell phone, Assistant Chief Augustine departed from the scene to obtain a search warrant.

A photograph of a bench was taken by Captain Walker at 12:46 a.m. and was introduced by the Defendant at trial as D #1. At 1:07 and 1:08 a.m., Captain Walker photographed empty casings. The sidewalk where the Defendant was found was photographed at 1:22 a.m., after he was removed from the scene, to get another shot of his cell phone. The last photo was taken at 1:47 a.m., depicting a spent bullet and a pool of blood on the cement floor inside the shed. This photo, however, was not introduced at trial. The 911 incident report, State's Exhibit 2, indicates that the ambulance left the scene with the Defendant at 1:19 a.m.

On appeal, the Defendant re-urges that none of the evidence obtained during these searches should have been admitted into evidence. First, the Defendant contends that the premises belonging to the Defendant and victim were searched without obtaining consent or a search warrant. Additionally, search warrants were later obtained, with the use of evidence initially seized to support a finding of probable cause. As such, the Defendant maintains that the evidence should not have been admitted, and thus, he should be granted a new trial.

With regard to the original search, the Defendant asserts that every officer who testified at the suppression hearing confirmed that neither the Defendant, nor the victim, was asked for permission to search the premises, nor did they give written or verbal consent. Also, the Defendant contends that the search and seizure following

29

the rendering of emergency aid went on long after the emergency was resolved and the area secured. The Defendant avers that this court's interpretation of *Mincey*, 437 U.S. 385, was expansive and provided no justification for the "wide ranging exploratory search" that occurred herein. The Defendant concludes that the plain view justification of the search under the emergency aid doctrine serves to resurrect the murder scene exception under another name.

Additionally, the Defendant argues that Captain Walker admitted at the hearing that the photographs taken were of evidentiary items found after they decided to search the premises to find evidence related to the events. The Defendant also complains that Captain Walker reportedly took pictures of the casings as he would find them and that the process took longer than an hour as evidenced by the time stamp on the photographs. As such, the Defendant maintains that the State's assertion that the officers were merely gathering evidence in plain view is not supported by the record, and instead indicates that they were generating evidence to be used in a criminal prosecution. The Defendant concludes that the search is "virtually indistinguishable" from the search in *Thompson*.

The evidence seized and introduced at trial by the State included a handgun found near the victim, the magazine that was in the gun, and two voice recorders. (State's Exhibit 9, 10, 11 and 12). Four photographs were also introduced into evidence, including a photo of the Defendant on the ground outside of the shed, a photo of the victim on the floor of the shed, a photo of the pistol found near her body, and a photo of the two recording devices sitting on a chair. The time stamps on the photographs indicate that the pictures were taken between 12:43 and 12:44 a.m., soon after the arrival of the officers. (State's Exhibit 4A, 4B, 4C and 4D). The State adds

30

that the remaining evidence seized was not introduced by the State and that no evidence seized as the result of a search warrant was introduced into evidence. As such, the State maintains that search and seizure issues related to the evidence seized, but not introduced into evidence by the State or Defendant, are moot.

Next, the State argues that all of the photographs entered into evidence at the suppression hearing and at trial were taken when the victim or the Defendant were being given emergency medical aid. The State refers to Avoyelles 911 which indicates that the first ambulance arrived at 12:33 a.m. and the second ambulance left the scene with the Defendant at 1:19 a.m. The State also submits that the initial search of the premises was justified to render immediate emergency medical aid. Distinguishing the instant case from *Thompson*, the State asserts that the search was begun before the victim and defendant were removed from the residence when a warrantless entry under an emergency situation was underway and the evidence seized was in plain view.

In further support of its argument, the State refers to *State v. Aicklen*, 00-1181 (La.App. 4 Cir. 6/14/00), 767 So.2d 116, wherein officers entered the defendant's apartment to see if he was in need of assistance and seized a crack pipe in plain view. The defendant's father informed officers of his belief that the defendant was suicidal and allowed entry into the defendant's apartment. The court held that once officers were lawfully in the defendant's apartment to provide emergency assistance, the officers could seize the crack pipe under the plain view doctrine.

From the jurisprudence cited by both parties, it is clear that written or verbal consent was not required before officers entered the premises to render emergency aid to the Defendant and victim. As such, the intrusion of officers into the Defendant's backyard and shed was clearly justified. The issues remaining, however, are whether

31

the evidence seized was in plain view and whether the search continued after the emergency was resolved.

Considering the testimony at trial and at the hearing, we find that the evidence discovered was in plain view and was discovered while the victim or the Defendant was on the premises. There is no evidence to show that anything was moved to provide visual access to the items seized. Moreover, the testimony and photographs admitted into evidence indicate that the items seized were located near the victim and Defendant. Lastly, the record is void of any evidence which suggests that expansive search occurred upon the arrival of officers and emergency personnel.

Given no proof that the evidence seized was not in plain view and that the search continued after the emergency was resolved, we find that there is no merit to this assignment of error as it pertains to the trial court's denial of the Defendant's motion to suppress.

ASSIGNMENT OF ERROR NO. 5:

By this assignment of error, the Defendant argues that the trial court erred in allowing the State to introduce highly prejudicial and irrelevant evidence. The Defendant complains that at trial, the State was allowed to introduce copies of a petition for divorce filed by the Defendant in 2005. The Defendant maintains that the divorce petition was irrelevant to the murder charge and that the State advanced no viable argument to support a finding of relevancy. The Defendant concludes that the evidence was clearly intended to unfairly prejudice the jury against him by establishing that he had averred in the past that the victim was at fault in the breakup of their marriage.

The divorce petition at issue was filed by the Defendant on September 9, 2005, and alleged that the couple separated on August 27, 2005. The Defendant alleges in the petition that the victim was "soley at fault in causing the break-up" of the marriage, and thus, was not entitled to receive spousal support. On October 5, 2005, a judgment was rendered, indicating that the parties had reconciled and dismissing the petition.

At trial, the Defendant objected to the State's introduction of the petition. The Defendant argued that the petition was not relevant. The State responded that the petition was relevant in determining the reasonableness of the element of provocation. At the time of the shooting, the victim was asking for a divorce and was seeing another man, twenty months after the Defendant has filed suit against her for divorce. The State maintained that the petition dealt with the Defendant's state of mind and what a reasonable person's state of mind might have been or should have been under the circumstances. The State added that the Defendant was not a person whose marriage was a sacred and untouchable thing. The Defendant had declared it dead twenty months prior to the shooting.

In concluding that the petition was relevant, the trial court stated:

I think it's relevant that we did go back into her relationship with Mr. Plauche when it began. When did the marriage disintegrate, things of that nature. I don't think I can lock off and say anything prior to a certain date. I'm going to allow in, it's public record. So it involves the marriage between Joe and Margaret and I'm going to deem it relevant.

On appeal, the Defendant refers to La.Code Evid. 401, which defines relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The Defendant argues that the State was unable to

33

articulate any fact or consequence that the old divorce pleading would tend to make more probable. Further, even assuming that the petition was marginally relevant, the Defendant maintains that the probative value is substantially outweighed by the danger of unfair prejudice under La.Code Evid. art. 403. Louisiana Code of Evidence Article 403 reads, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."

The Defendant also refers to *Old Chief v. United States*, 519 U.S. 172, 180, 117 S.Ct. 644 (1997), wherein the Court defined unfair prejudice regarding a criminal defendant as "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." As such, the Defendant asserts that the petition more likely suggested a decision on an emotional basis which was unfairly prejudicial.

In opposition, the State argues that the petition was simply a statement of fact or a part of the story, tending to negate the legal conclusion that the Defendant acted in sudden passion or heat of blood. The State also maintains the admission did not prejudice the jury when it was shown that the Defendant knew of the victim's affair for two weeks prior to the shooting. Also, on the night of shooting the Defendant had planned to tell their children of their plans to divorce. Lastly, the State contends that any error in the admission of the petition was harmless, because of the fact that it had been filed was admitted by the victim's mother during her testimony without objection from the Defendant.

Considering the arguments presented by both parties, we find that the State did articulate a fact or consequence that the prior divorce pleading would tend to make

34

more probable. The divorce pleading was used to negate the legal conclusion that the Defendant acted in sudden passion or heat of blood. The pleading was filed by the Defendant twenty months before the shooting and was evidence that the couple's marriage was in trouble and the Defendant desired to end the marriage. We agree that this fact tends to negate the possibility that the Defendant acted in sudden passion or heat of blood upon learning of the victim's affair two weeks prior to the shooting.

Also, the Defendant has not specified how the fact that he sought a divorce twenty months prior to the shooting served to lure the jury into declaring guilt on a ground different from the evidence necessary to prove the offense as charged. A divorce petition is not evidence of another crime or offense. Lastly, even assuming that in some manner the divorce petition shed a negative light on the Defendant, we find that the Defendant has not shown that the danger of unfair prejudice outweighed the probative value of the evidence which was used to negate an element of the crime. Accordingly, this assignment of error is without merit.

<u>ASSIGNMENT OF ERROR NO. 6</u>:

By this assignment of error, the Defendant argues that the trial court erred in denying a mistrial after contact between a member of the prosecutor's staff and jurors. The Defendant contends that on the first day of trial, a staff member from the district attorney's office, Cherie Deshautelle, and the judge's secretary were in the jury room during the lunch break while the jury members were present. Due to the contact between the jurors and Ms. Deshautelle, the Defendant maintains that a mistrial was warranted.

The Defendant also argued that anything that could be construed as an attempt to be friendly or favorable to jurors was an impermissible event. The Defendant

35

asserted that an agent of the State was in the presence of the jurors when their lunches were handed out and the jurors could have assumed that the State was paying for the lunches. As such, the Defendant moved for a mistrial. The trial court, however, found no evidence of jury tainting "whatsoever" or appearance of impropriety. We agree.

The record reflects that Ms. Deshautelle, the district attorney's docket clerk, assisted during jury selection and opening statements and was expected to assist with the remainder of trial. During the lunch break on the first day of trial, counsel for the Defendant observed Ms. Deshautelle in the jury room while members of the jury were present. Ms. Deshautelle testified that she was in the room picking up lunch for the office employees, but did not have any conversations with any of the jurors, nor did any juror ask her a question. According to Ms. Deshautelle, she just "grabbed" their lunch and walked out. She did not recall whether any jurors were in the room.

Bailiff Cleo Lewis testified that he had taken orders for lunch and explained that various people involved with the trial entered the jury room to pick up their food. Mr. Lewis testified that Ms. Deshautelle entered the jury room, picked up the lunches for the district attorney's office and left. Ms. Deshautelle spoke to no one other than Mr. Lewis regarding the lunches, and none of the jurors made any comments to her. Lastly, Mr. Lewis stated that Deputy Joshua Spillman entered the jury room and spoke briefly to Ms. Deshautelle, but not to any of the jurors.

Deputy Spillman testified that he entered the jury room for about three seconds to give Ms. Deshautelle a work-related message. None of the jurors spoke with Deputy Spillman and he did not say anything to any of the jurors.

On appeal, the Defendant refers to three cases in support of his argument. First, in *State v. Sinegal*, 393 So.2d 684 (La.1981), one juror read to the other jurors from

36

an outdated law book which incorrectly stated the law on the charge. The trial court did not discover the error and was later unable to evaluate the prejudice which may have resulted. The court found that the book was an extraneous influence that invalidated the jury's verdict.

The Defendant also refers to *State v. Bates*, 508 So.2d 1346 (La.1987). In *Bates*, the supreme court held that the district attorney's conduct in sending a pretrial letter and questionnaire on official letterhead to the jury venire to aid him in jury selection required the reversal of the defendant's conviction and sentence. In reaching its decision, the court referred to the American Bar Association's (ABA) position on the issue, stating, "The reasons for the ABA's condemnation of such a practice are obvious: unilateral *ex parte* juror contacts can only result in a skewing of the otherwise impartial administration of justice." *Id*. at 1350.

Lastly, the Defendant cites *State v. Copeland*, 419 So.2d 899 (La.1982), wherein the trial judge's deputy-bailiffs presented gifts, handcuff stickpins, to the jurors. In reversing the defendant's conviction, the court stated:

> Such gift giving has no place in the conduct of a serious criminal case such as this and quite likely did constitute a subtle influence, pro state, the full extent of which is impossible to ascertain. Furthermore, the jurors' testimony that they were uninfluenced thereby, however honest and candid, can hardly be dispositive on the issue, considering the subtlety of the influence.

*Id*. at 904.

The actions of Ms. Deshautelle do not rise to extent of those in the jurisprudence cited by the Defendant. Ms. Deshautelle simply entered the room, picked up food and promptly left the room. The record reflects that she did not communicate with any jurors, nor did any jurors attempt to or successfully communicate with her. Unlike the cases cited, there is no evidence in the instant case

37

of any type of exchange between Ms. Deshautelle and any juror. Accordingly, we find that the trial court properly denied the Defendant's motion for a mistrial, and thus, this assignment of error has no merit.

ASSIGNMENT OF ERROR NO. 7:

In his final assignment of error, the Defendant argues that the trial court erred in imposing a constitutionally excessive sentence and in denying his motion to reconsider sentence. More specifically, the Defendant, a first felony offender, maintains that there is nothing in the record to support the imposition of the maximum sentence.

In his Motion to Reconsider Sentence filed in the trial court, the Defendant did not set forth a specific ground upon which his motion was based, stating only that his maximum sentence was excessive. Pursuant to La.Code Crim.P. art. 881.1(E), a motion to reconsider sentence must be based upon a specific ground, and thus, the Defendant is relegated to a bare claim of excessiveness. *State v. Mims*, 619 So.2d 1059 (La.1993); *State v. Franco*, 08-1071 (La.App. 3 Cir. 4/1/09), 8 So.3d 790.

In *State v. Semien*, 06-841, pp. 11-12 (La.App. 3 Cir. 1/31/07), 948 So.2d 1189, 1197, *writ denied*, 07-448 (La. 10/12/07), 965 So.2d 397, this court stated:

> The Eighth Amendment to the United States Constitution and La. Const. art. I, § 20 prohibit the imposition of cruel or excessive punishment. " '[T]he excessiveness of a sentence becomes a question of law reviewable under the appellate jurisdiction of this court.' " *State v. Dorthey*, 623 So.2d 1276, 1280 (La.1993) (quoting *State v. Sepulvado*, 367 So.2d 762, 764 (La.1979)). Still, the trial court is given wide discretion in imposing a sentence, and, absent a manifest abuse of that discretion, we will not deem as excessive a sentence imposed within statutory limits. *State v. Pyke*, 95-919 (La.App. 3 Cir. 3/6/96), 670 So.2d 713. However, "[m]aximum sentences are reserved for the most serious violations and the worst offenders." *State v. Farhood*, 02-490, p. 11 (La.App. 5 Cir. 3/25/03), 844 So.2d 217, 225. The only relevant question for us to consider on review is not whether another sentence would be more appropriate, but whether the trial court abused its broad discretion

38

in sentencing a defendant. *State v. Cook*, 95-2784 La.5/31/96), 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

To decide whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, this court has held:

> [An] appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00), 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96), 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061.

Pursuant to La.R.S. 14:31, the Defendant's forty-year hard labor sentence was the maximum possible sentence for a manslaughter conviction. In determining the appropriate sentence, the trial court addressed provocation for the Defendant's actions and that the jury's verdict of manslaughter indicated that they felt there was some provocation herein. The trial court stated, however, that it strongly believed that a spouse's intimation or statements to the other never constitutes sufficient provocation to take a life.

The trial court then reviewed for the record the significant mitigating and aggravating circumstances of the case. The trial court found that the Defendant's conduct during the commission of the crime manifested a deliberate cruelty to the victim. The victim was shot in the neck and no aid was rendered by the Defendant. The Defendant did not call 911 after the shooting but allowed the victim to "waddle"

39

on her back. Also, the Defendant used violence and a dangerous weapon in the commission of the offense and the offense resulted in significant permanent injury and economic loss to the victim and her family. The trial court found no grounds which were substantial enough to excuse or justify his conduct, nor did it conclude that the victim induced or facilitated the commission of the crime. Contemplating divorce or ending a marriage, the trial court stated, did not justify the violent crime.

In mitigation, the trial court noted that the Defendant had no history of delinquency or criminal activity and that the circumstances were unlikely to reoccur. The trial court also opined that imprisonment would entail excessive hardship to his children. However, the trial court stressed that it had to weigh the family's needs with the unjustified act of taking a life. Also, the trial court stated that it paid special attention to the needs and desires of the children. The trial court concluded that the consequences of taking a life could not be lessened because the Defendant had children and that a lesser sentence would deprecate the seriousness of the crime.

Further, the trial court believed that the facts of the case were more akin to a second-degree murder than a typical manslaughter. The court explained that there were no threats made by the victim. The trial court also acknowledged that the marriage had failed or dwindled, causing a surge of emotions. The trial court found, however, that such emotions did not justify the taking of a life. Also, a paramour, the trial court stated, was no reason to take a life.

The trial court then compared the facts of the instant case to those in *State v. Griffin*, 06-543 (La.App. 3 Cir. 9/27/06), 940 So.2d 845, *writ denied*, 07-2 (La. 9/14/07), 963 So.2d 995, a case decided by the same trial court. In *Griffin*, the defendant was charged with second degree murder, but found guilty of manslaughter.

40

The defendant was sentenced to thirty-five years at hard labor. Relying on this court's decision in *State v. Carrier*, 95-1003 (La.App. 3 Cir. 3/6/96), 670 So.2d 794, *writ denied*, 96-881 (La. 9/20/96), 679 So.2d 431, the defendant's sentence was affirmed. In reaching its decision, this court observed the trial court's finding that there was insufficient provocation to support a verdict of manslaughter. In the instant case, the trial court noted that the victim did not threaten the Defendant as did the victim in *Griffin*. Also, like the conclusion in *Griffin*, the trial court found that there was no provocation herein.

In its written reasons for denying the Defendant's motion to reconsider, the trial court indicated that although the facts established that the victim was having an affair, there was no sudden occurrence, such as the discovery of the affair on the evening of the shooting. The evidence revealed that the Defendant was aware of the victim's relationship with her paramour two weeks prior to the shooting. Also, the trial court found no evidence to show that the victim provoked the Defendant in any way on the evening of the shooting. As such, the trial court opined that the average person's blood would have cooled by the time of the shooting and that the jury's decision appeared to be a "soft-hearted notion."

We are in agreement with the trial court. Based on the heinous nature of the crime without justification or provocation, the wealth of jurisprudence cited by both parties, and the great discretion owed to the trial court's decision in imposing the sentence, we find that there was no abuse of discretion on the part of the trial court and that the sentence is proper. Accordingly, we find that this assignment of error is without merit.

**CONCLUSION:**

We find no merit in the Defendant's assignments of error. Accordingly, we affirm the defendant's conviction, as well as the sentence imposed by the trial court.

**AFFIRMED.**